**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

      Plaintiff,

vs.                                                                              No. CR 09-2477 MCA

**NORA BACA,**

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on *Nora Baca's Motion to Suppress* [Doc. 32], filed July 13, 2010.  On October 5, 2010; October 6, 2010; and February 22, 2011, the Court held evidentiary hearings on Defendant's *Motion*.[1]  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the *Motion* based upon the following findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

1.      On July 15, 2009, six members of the Bernalillo County Sheriff's Office (BCSO) congregated near 1413 El Oriente, SW in order to execute three arrest warrants for Kevin Pressley.  [Doc 49 at 9-10, 47]

---

[1] This hearing was consolidated with the evidentiary hearing on a suppression motion held in the case of United States v. Destry Naylor, 09cr2476, because the respective motions raised substantially the same factual issues.

2. On June 5, 2009 and July 4, 2009, BCSO made undercover purchases of narcotics from Pressley at the 1413 El Oriente residence. [Id. at 43]

3. Detective Jamal Jackson secured a search warrant for the 1413 El Orient residence on July 7, 2009. [Id. at 8-9, 43]

4. Detective Jackson proceeded with caution in executing the warrant because 1413 El Oriente had been the subject of an Albuquerque Police Department raid in June 2008 and a methamphetamine laboratory was discovered at the residence at that time. [Id. at 11-13]

5. The BCSO team arrived at 1413 El Oriente at approximate 5:00 p.m. on July 15, 2009. [Id. at 13]

6. Detective Jackson did not immediately approach the house and serve the warrant because there was potentially a methamphetamine laboratory inside. [Id. at 13-14]

7. The residence had a "For Sale" sign in the yard. [Id. at 48]

8. Destry Naylor arrived at the residence in his pick up truck, and as he got out of the vehicle, Pressley came out of the residence to greet him. [Id. at 14-15]

9. Pressley was identified by the BCSO team as the subject of the warrant. [Id. at 17]

10. Both men went back inside the residence. [Id. at 15]

11. Soon after, Defendant drove a recent-model BMW up the street and parked near 1413 El Oriente. [Id. at 15-16]

12. Pressley and Naylor came out of the house and spoke with Defendant in the front yard of the residence. [Id. at 17]

13. Detective Louiz Funes, a plain clothes member of the BCSO team, approached the residence and asked questions about whether the house was for sale. [Id. at 170-71]

14. Detective Funes then gave the signal for the other law enforcement agents to move in; he pulled out his gun and his badge. [Id. at 171, 176-77]

15. On receiving the signal, the rest of the team arrived in the yard. [Id. at 177]

16. Detective Jackson, Detective Funes, and Sergeant Shureke Covington remained in the yard with Pressley, Naylor, and Defendant. [Id. at 17-30, 178, 108]

17. Detective Robert Bolin, Detective Joaquin Rodriguez, and Detective Michael Fisher proceeded inside the residence in order to secure and search the premises. [Id. at 164, 191, 202]

18. Detective Jackson first approached Pressley, introduced himself, and presented the warrants. [Id. at 17]

19. Although it is unclear whether Naylor and Defendant were handcuffed at this time, the Court finds that they were being supervised by police officers and were not free to leave.

20. Pressley was arrested and Detective Jackson read him his rights. [Id. at 18-19]

21. Detective Jackson searched Pressley and located a quantity of methamphetamine, divided into different amounts and secured in small plastic ziploc baggies, as well as a clear glass pipe. [Id. at 19-20, 22]

22. Pressley was placed in a police vehicle. [Id. at 25]

23. Detective Jackson next approached Naylor and spoke with him. [Id.]

24. After speaking with Pressley and Naylor for approximately 20 minutes, Detective Jackson approached Defendant and escorted her to stand near the BMW. [Id. at 29-30, 86]

25. Detective Jackson introduced himself, read Defendant her rights, and asked whether she understood her rights. [Id. at 30]

26. Sergeant Covington credibly testified that he witnessed Detective Jackson read Defendant her rights. [Id. at 108]

27. After conducting a site visit, the Court finds that the yard is very narrow, at approximately 12 feet deep by 40 feet long.

28. Detectives Bolin, Funes, Rodriguez, and Fisher did not hear Detective Jackson read Defendant her rights, but they testified that they were focused on other events. [Id. at 161, 164 (Bolin participated in the execution of the warrant on the house); 173 (Funes was not near Jackson); 186, 191 (Rodriguez was photographing the inside of the residence); 202, 206-07 (Fisher was concentrating on the house)]

29. Detective Jackson asked Defendant if she would answer questions, and Defendant responded in the affirmative. [Id. at 30]

30. Detective Jackson asked whether Defendant was carrying any weapons in her purse or on her person. [Id.]

31. Defendant responded that she was not carrying weapons and that Detective Jackson could check her purse. [Id.]

32. Sergeant Covington credibly testified that he heard Defendant give consent for

Detective Jackson to search her purse. [Id. at 110]

33. Detectives Bolin, Funes, Rodriguez, and Fisher testified that they did not hear Defendant give her consent to search the purse, but these officers were focused on other events. [Id. at 161, 164 (Bolin participated in the execution of the warrant on the house); 174-76 (Funes was watching the other subjects); 186, 191 (Rodriguez was photographing the inside of the residence); 202, 207 (Fisher was focused on the house)]

34. Detectives Bolin, Funes, Rodriguez, and Fisher testified that they did not hear Defendant refuse consent to search the purse, contrary to her position that she refused repeatedly and loudly. [Id. at 169, (Bolin); 183 (Funes); 196 (Rodriguez); 211-12 (Fisher)]

35. Detective Jackson proceeded to check Defendant's purse for weapons, and he testified that he found a large sum of cash and a used syringe. [Id. at 30-31]

36. Detective Jackson testified that Defendant told him that she used the syringe for cocaine. [Id. at 31]

37. The inventory sheet verifies that United States currency was found in Defendant's purse, but does not make note of a syringe.

38. Detective Jackson did not remember whether the syringe was tagged into evidence, but he acknowledged that it did not appear on the inventory. [Id. at 88]

39. Detective Jackson acknowledged that he has seen no photographs of the syringe. [Id. at 89]

40.  After searching Defendant's purse, Detective Jackson asked whether he could look in the BMW. [Id. at 31]

41.  Defendant said "that's fine." [Id. at 32]

42.  Sergeant Covington credibly testified that he heard Defendant give Detective Jackson consent to search the vehicle. [Id. at 110]

43.  Detectives Bolin, Funes, Rodriguez, and Fisher testified that they did not hear Defendant give her consent to search the vehicle, but again, these officers were focused on other events. [Id. at 161, 164 (Bolin); 175-76 (Funes); 186, 191 (Rodriguez); 202, 207 (Fisher)]

44.  Detectives Bolin, Funes, Rodriguez, and Fisher testified that they did not hear Defendant refuse consent to search the vehicle, contrary to her position that she refused repeatedly and loudly. [Id. at 169, (Bolin); 183 (Funes); 196 (Rodriguez); 211-12 (Fisher)]

45.  After receiving consent to look in the BMW, Detective Jackson opened the doors and looked inside. [Id. at 32]

46.  Detective Jackson opened the rear passenger door and observed some items behind the driver's seat and a dark-colored suitcase on the back seat. [Id. at 32-33]

47.  The item on the floor behind the driver's seat was a plastic bag, which he could see (without touching) contained another clear plastic bag. [Id. at 34-35]

48.  Inside the second bag were multiple crystal-like shards, the size of a man's pinkie finger and what was shaped like a CD on top of the bag. [Id. at 35-36]

49.  The shards appeared similar (but larger) to the substance that was found on Pressley, which had proved to be methamphetamine. [Id. at 36]

50.  In Detective Jackson's training and experience, scales can be disguised as CDs. [Id. at 37]

51.  Detective Jackson informed his supervisor of what he found and left to secure search warrants. [Id. at 38]

52.  Defendant offered into evidence the search warrant affidavit, which makes the following factual assertions:

> Detectives identified the female as Ms. Nora Baca. Detectives read Miranda rights to Ms. Baca and asked did she understand what was read to her. Ms. Baca said, "Yes." Detectives asked Ms. Baca did she wish to answer any our questions. She said, "Yes." Detectives asked Ms. Baca did she have any weapons on her person. Ms. Baca said, "No." Ms. Baca stated we could look into her purse. Inside a small beige purse detectives found a large sum of cash in small denominations of US currency. Ms. Baca was asked approximately how much money was in her purse. Ms. Baca stated approximately $4,000.00. A syringe was also located inside her purse. Mr. Baca was asked for what purpose did she possess a syringe. Ms. Baca stated she uses the syringe for cocaine.
>
> Detectives asked Ms. Baca for permission to look inside the BMW she arrived in. Ms Baca said, "Yes." Inside the vehicle on the floor behind the driver seat was a plastic bag. Inside the plastic bag was a digital scale in the form of compact disc (CD). Another plastic bag was located inside the bag that held the scale. Inside this plastic was another plastic bag that contained white crystal like substances. I have become familiar with this substance through education, training and experience and know it to be Methamphetamines.
>
> Detectives conducted an investigation into Ms. Baca's arrest history and learned she was arrested several times for Possession of a Controlled Substance and Felon in Possession of a firearm as recent as 1999 and 2002.

53. On returning with the warrants, Detective Jackson searched Defendant's vehicle. [Id. at 41]

54. The CD-shaped object was in fact a scale. [Id. at 41]

55. The plastic bags, the crystals, the scale, and two ledgers were logged on the inventory sheet as evidence.

56. Defendant was indicted on August 27, 2009 on one count of possession of a controlled substance with intent to distribute, contrary to 21 U.S.C. § 841(a)(1)(A) and (b)(1)(B). [Doc 4]

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Defendant makes four arguments: (1) she contends that her initial detention was unlawful; (2) she argues that she was not informed of her Fifth Amendment rights before she was interviewed; (3) she maintains that she did not consent to the search of her or the BMW; and (4) she challenges the veracity of the warrant affidavit. Also, at the October 6, 2010 hearing, Defendant argued that certain testimony should be struck because it was not properly disclosed under Federal Rule of Criminal Procedure 16. The Court begins by considering the disclosure issue.

### A. Rule 16 Violations

In the evening following the October 5, 2010 hearing, the first day of the suppression hearing, the Government informed Defendant that it had become aware of post-arrest statements. [Doc 50 at 13-16] As a result, the Government announced that it intended to call rebuttal witnesses, who could testify about the post-arrest statements, in order to

discredit some statements made by Naylor and Pressley. [Id. at 14] On October 6, 2010, Defendant moved the Court, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, to strike any testimony regarding any undisclosed statements made by any defendant. [Id. at 22]

Rule 16(a)(1)(A) states that "[u]pon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." The Rule continues to establish a continuing obligation of disclosure: "A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if . . . the evidence or material is subject to discovery or inspection under this rule. . . ." Rule 16(c)(1). Our Circuit has explained that

> [w]hen it comes to the district court's attention that the government has failed to comply with Fed.R.Crim.P. 16, 'the court may order [the government] to permit the discovery or inspection, grant a continuance, or prohibit the [government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.'

United States v. Ivy, 83 F.3d 1266, 1280 (10th Cir. 1996) (alterations in original) (quoting Fed. R. Crim. P. 16(d)(2)).

At the October 6, 2010 hearing, after hearing from the parties, the Government represented that it would track down the alleged post-arrest statements and the agents or officers who took the statements. [Doc 50 at 33-25] The Court took the matter under advisement and reconvened on February 22, 2011. [Id. at 42; Doc 61] On that date, the

9

Government produced two witnesses, Agent Tom Bartusiak and Detective Chris Romero, to testify regarding the alleged post-arrest statements. Naylor and Defendant then renewed their objections under Rule 16. [Id. at 4-9] Further, Naylor and Defendant represented that they never received any further information from the Government regarding the content of the statements or any reports by the agent or officer who took the statement. [Id.] The Government responded that it gave them all the information that it had: on October 5, 2010, prior to the second day of the suppression hearing, the Government emailed Defendant's counsel a summary of the statement purportedly made by Defendant, as recounted from the memory of the officer who took the statement. [Id. at 8]

The Court finds that the Government provided Defendant with the contents of the post-arrest statement when it learned that a post-arrest statement had been made and that the Government acted in good faith to make the required disclosures. Further, given the breadth of this Court's discretion to impose a remedy under Rule 16(d)(2), even if the Court found that the Government failed to comply with Rule 16, Defendant had ample time to review the contents of the statement, as read into the record on October 6, 2010 [Doc 50 at 29], in order to prepare for the next hearing or a future trial. Accordingly, the Court denies Defendant's motion to strike the testimony of Agent Bartusiak and Detective Romero for failure to disclose.

**B.     Initial Detention**

In her closing brief, Defendant argues for the first time that "[t]he warrantless seizure and detention of Ms. Baca without any specific factual basis to reasonably suspect her or

probable cause to de facto arrest her violated her Fourth Amendment rights." [Doc 62 at 18] The Supreme Court of the United States has explained that "officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." Muehler v. Mena, 544 U.S. 93, 98 (2005). Further, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." Id. Because the governmental interests outweigh the marginal intrusion, the use of handcuffs in these circumstances is permitted. Id. at 98-99. This is because the detention is less intrusive than the search, and because detention serves the law enforcement goals of preventing flight in the event that incriminating evidence is found, minimizing risk of harm to officers, and facilitating orderly completion of the search. Id. at 98. Our Circuit has read Muehler and the underlying authority Michigan v. Summers, 452 U.S. 692 (1981), to provide authority for officers in these circumstances to detain "all persons present on the premises," and not only confirmed residents. United States v. Sanchez, 555 F.3d 910, 918 (10th Cir. 2009).

      There is no dispute that the BCSO team was present at 1413 El Oriente to execute a valid search warrant on the Presley premises. Accordingly, Defendant was properly detained as an occupant of the premises. As noted earlier, it is unclear whether she was initially or immediately handcuffed, but even if she was, this intrusion is outweighed by law enforcement interests. This particular house had previously been identified as a methamphetamine lab, making this particular search inherently dangerous for the BCSO

probable cause to de facto arrest her violated her Fourth Amendment rights." [Doc 62 at 18] The Supreme Court of the United States has explained that "officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." Muehler v. Mena, 544 U.S. 93, 98 (2005). Further, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." Id. Because the governmental interests outweigh the marginal intrusion, the use of handcuffs in these circumstances is permitted. Id. at 98-99. This is because the detention is less intrusive than the search, and because detention serves the law enforcement goals of preventing flight in the event that incriminating evidence is found, minimizing risk of harm to officers, and facilitating orderly completion of the search. Id. at 98. Our Circuit has read Muehler and the underlying authority Michigan v. Summers, 452 U.S. 692 (1981), to provide authority for officers in these circumstances to detain "all persons present on the premises," and not only confirmed residents. United States v. Sanchez, 555 F.3d 910, 918 (10th Cir. 2009).

There is no dispute that the BCSO team was present at 1413 El Oriente to execute a valid search warrant on the Presley premises. Accordingly, Defendant was properly detained as an occupant of the premises. As noted earlier, it is unclear whether she was initially or immediately handcuffed, but even if she was, this intrusion is outweighed by law enforcement interests. This particular house had previously been identified as a methamphetamine lab, making this particular search inherently dangerous for the BCSO

team. Muehler, 544 U.S. at 100 (in inherently dangerous situations, including drug searches, "the use of handcuffs minimizes the risk of harm to both officers and occupants"). Further, the team was required to detain multiple individuals, Defendant, Naylor, and Pressley, which also makes reasonable the use of handcuffs. Id. The Court therefore finds in the immediate detention of Defendant no violation of her Fourth Amendment rights.

**C.** **Miranda Advisement**

Defendant next argues that any statements she made must be suppressed because she was not advised of her Fifth Amendment rights. [Doc 37 at 7] It is well established that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. 436, 444 (1966). Those procedural safeguards are such that "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. Before Miranda even is applicable, two requirements must be satisfied: (1) the suspect must be "in custody" and (2) the questioning must meet the legal definition of "interrogation." United States v. Bennett, 329 F.3d 769, 774 (10th Cir. 2003). Detective Jackson credibly testified that he advised Defendant of her Miranda rights. Sergeant Covington verified Detective Jackson's testimony. Although none of the officers heard the advisement, it is clear from their testimony that the other officers were reasonably focused on their assigned tasks. The Court finds that Detective Jackson advised Defendant of her

Miranda rights and that in response, she waived those rights.

In her written closing argument, Defendant protests that even if she was read her rights, she did not waive them voluntarily. A defendant may waive his Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. Whether a defendant has waived his Miranda rights "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008) (internal quotation marks and citation omitted). Waiver in this context is a two-part inquiry: (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2) "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Colorado v. Spring, 479 U.S. 564, 573 (1989) (internal quotation marks and citation omitted) (Spring). "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. (internal quotation marks and citation omitted). A waiver is involuntary only if the interrogating agent "took unfair advantage of [the] defendant's traits or the surrounding circumstances." United States v. Lamy, 521 F.3d 1257, 1261 (10th Cir. 2008) (alteration in original) (internal quotation marks and citation omitted). The relevant factors include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4)

13

whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment." Id. at 1262.

Defendant maintains that her waiver was involuntary because the BCSO team arrived with guns drawn, because she was *de facto* arrested, because she was separated from Pressley and Naylor, and because she was in handcuffs. [Doc 62 at 21] Defendant does not argue that her personal characteristics prevented her from knowingly waiving her rights. The length of the detention, to the point of the advisement of rights and the waiver, was approximately twenty minutes. [Doc 49 at 86] No evidence was presented regarding the "length and nature of the questioning;" indeed, Defendant does not specifically identify *which* statements should be excluded. According to Detective Jackson, the waiver itself was the product of the first or second question, and there is no evidence that Detective Jackson was harsh with Defendant, used threatening language, or imposed any physical punishment.

The totality of the circumstances demonstrates that Defendant was confronted with six armed officers coming toward her in an enclosed space. She was taken into custody—whether she was handcuffed, it is clear she was not free to leave. At that point, she was left under the care of one officer while the other two were interviewed. The entire event took place in public. United States v. Silva-Arzeta, 602 F.3d 1208, 1214, 1215 (10th Cir. 2010) (one factor reducing possibility of intimidation is that encounter occurs in public setting). Twenty minutes later, Detective Jackson approached her, introduced himself, and advised her of her rights. While the initial "take-down" must have been alarming, twenty minutes later, there is no reason that Defendant could not make an "uncoerced choice" to

14

waive her rights. Spring, 479 U.S. at 573.

**D.     Consent to Search**

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. "Absent voluntary consent and subject to a few well-recognized exceptions, searches conducted without a warrant and probable cause are presumed unreasonable." United States v. Walsh, 791 F.3d 811, 814 (10th Cir. 1986). A consent to search must be voluntary, with voluntariness being a question of fact to be determined by the totality of the circumstances. As the Tenth Circuit has recently reaffirmed, "[t]he central question is whether a reasonable person would believe [s]he was free to . . . disregard the officer's request[, with t]he proper inquiry center[ing] on whether the defendant suffered, *inter alia*, physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery." Silva-Arzeta, 602 F.3d at 1214 (internal quotations omitted).

Defendant initially claims that Detective Jackson was not truthful when he testified that she consented to the search of her purse and her vehicle. She argues that she "repeatedly and unequivocally stated, in the most emphatic terms, that she was not granting Det. Jackson, or anyone else, consent to search her purse." [Doc 32 at 11] She insists that she "loudly and repeatedly declared to Detective Jackson that he did not have her consent to search her car." [Id. at 12] Detective Jackson testified that she gave consent in both instances, and Sergeant Covington corroborated that testimony. Defendant makes much of the testimony of the other officers who did not hear her give consent in the small yard. Nevertheless, it is apparent that

those other officers were assigned to different tasks, which demanded their focus and some of which took place inside Pressley's residence and away from the yard. Furthermore, each of those other officers testified that they did not hear Defendant refuse consent, even though she claims that she "repeatedly" and "loudly" did so. The Court finds credible Detective Jackson's corroborated testimony regarding Defendant's consent to search her purse and the vehicle.

Arguing in the alternative, Defendant again claims that if she did consent, she did not consent voluntarily. As with the waiver of rights, Defendant points to the circumstances of the officer's arrival—six officers with guns drawn—and contends that the environment was "extremely coercive." [Doc 62 at 19] In the Silva-Arzeta case, our Circuit determined that a defendant's consent to search was voluntary where at the time of the consent, the defendant was handcuffed and in the presence of several officers. 602 F.3d at 1214. There was no evidence that the officers "used any violence, threats, promises, trickery, or other forms of intimidation or deception that would render [the defendant's] consent involuntary. . . ." Id. (internal quotation marks and citation omitted). The potential for intimidation was reduced, the Silva-Arzeta Court noted because the scene was a public street, the defendant had received Miranda warnings, and the officers' weapons were holstered at the time of the consent.

Under these circumstances, the scene was a public street, Defendant received Miranda warnings, and there is no evidence that any weapons were drawn when Detective Jackson spoke with Defendant—or even that weapons had been recently drawn. The request for

16

consent to search the purse occurred approximately 20 minutes after the initial "take-down." Defendant was clearly in custody, and possibly handcuffed, but there is no evidence that Detective Jackson attempted to intimidate Defendant into consenting to any searches. See Silva-Arzeta, 602 F.3d at 1215 ("[T]he consent of a handcuffed arrestee may well be voluntary."). The Court therefore concludes that Defendant voluntarily consented to the search of her purse and the BMW.

**E.     The Warrant Affidavit**

A search conducted pursuant to a warrant is presumed valid, and the defendant bears the burden of demonstrating otherwise. See United States v. Carhee, 27 F.3d 1493, 1486 (10th Cir. 1994). A defendant may meet her burden of proof in this context if she can show that the search warrant's finding of probable cause depended on false or misleading information that the affiant had supplied with the knowledge that it was false, or with reckless disregard for the truth. See United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004). In this regard, a defendant may request an evidentiary hearing to test the veracity of a search warrant affidavit under the procedural framework articulated in Franks v. Delaware, 438 U.S. 154, 171-72 (1978).

Before the defendant will become entitled to such a hearing, however, she "must allege deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Artez, 389 F.3d at 1116. Allegations of negligence or innocent mistake are insufficient, and the defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Franks, 438 U.S. at

171. The defendant's allegations should point out specifically the portion (or portions) of the affidavit claimed to be false, and they should be accompanied by a statement of supporting reasons. Id. Finally, the defendant should provide witness affidavits, or satisfactorily explain their absence. Artez, 389 F.3d at 1116.

Still, even if these requirements are met, no hearing is required if, once the material that is the subject of the alleged falsity or reckless disregard is set aside, the affidavit includes sufficient content to support a finding of probable cause. Franks, 438 U.S. at 171-172. It is when the remaining content is not sufficient to support a probable-cause finding that the defendant becomes entitled to her hearing. See id. at 172. In short, then,

> a district court must hold a hearing to explore the sufficiency of the affidavit if the defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant" and that "the allegedly false statement [was] necessary to the finding of probable cause."

United States v. Lewis, 594 F.3d 1270, 1286 (10th Cir. 2010) (*quoting* Franks, 438 U.S. at 155-156).

Defendant argues that the search warrant affidavit lacked veracity (1) because the searches of the purse and car were not consensual; (2) because Detective Jackson allegedly incorrectly stated that he spoke with Defendant moments after dealing with Pressley and Naylor, and it was really "many minutes later;" and (3) Detective Jackson stated in his affidavit that "detectives" took certain actions, but it was really only he. [Doc 62 at 22] In her *Motion*, Defendant also claims (1) that the affidavit incorrectly stated that Detective

18

Jackson found $4,000, but the purse contained more money and (2) that there was no syringe in her purse.

The Court has found that Detective Jackson credibly testified that the searches of the purse and the BMW were consensual. Sergeant Covington confirmed this testimony. Even excising the remaining allegedly false information from the affidavit, it remains that after a consensual search of the BMW, Detective Jackson found a quantity of methamphetamine. This discovery of contraband in the BMW would have supported the search warrant, and thus, no hearing is required to test the veracity of the affidavit. Franks, 438 U.S. at 171-72 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."). Defendant has not bourne her burden of demonstrating that the warrant was invalid. Because the Court finds that the search warrant was valid, there is no reason for the Court to consider whether the United States v. Leon, 468 U.S. 897 (1984) good-faith exception applies to justify the search.

### III.   CONCLUSION

For the foregoing reasons, the Court will not impose sanctions for violation of Rule 16, nor will the Court conduct a Franks hearing to test the veracity of the warrant affidavit. Further, the initial detention of Defendant was valid, Defendant voluntarily waived her Fifth Amendment rights, and Defendant consented to the search of her purse and her vehicle.

**IT IS, THEREFORE, HEREBY ORDERED** that Defendant's *Motion to Suppress* [Doc 32] is **DENIED**.

**SO ORDERED** this 10th day of May, 2011, in Albuquerque, New Mexico.

                                                **M. CHRISTINA ARMIJO**
                                                United States District Judge